## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Brian W. Simpkins, Task Force Officer with the Drug Enforcement Administration, being duly sworn, depose and state as follows:

## INTRODUCTION

1.	I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been a Massachusetts State Police ("MSP") Trooper since 2006, and a Sergeant since October 2023. As a Trooper, I was initially assigned to patrol out of the Framingham, Sturbridge, and Boston Barracks, and then to the Community Action Team in the city of Boston working in a high crime area focusing on gang and drug activity.

2.	Since July 2016, I have been assigned as a Task Force Officer ("TFO") to the Organized Crime Drug Enforcement Task Force ("OCDETF") Boston Strike Force, which is a strike force incorporating various law enforcement agencies, including the Drug Enforcement Administration ("DEA"), the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI"), Immigration and Customs Enforcement Homeland Security Investigations ("HSI"), and the U.S. Marshals Service ("USMS"), among other agencies. As a DEA TFO, I am an investigative or law enforcement officer of a State, within the meaning of 18 U.S.C. §2510(7), who is empowered by law to conduct investigations for offenses enumerated in 18 U.S.C. §2516, which include violations of federal narcotics laws in violation of Title 21 of the United States Code.

3.	I am a graduate of the Municipal Police Training Committee ("MPTC") Police Academy (9th Municipal Police Officers Class, Weymouth), and the Massachusetts State Police Academy (79th Recruit Training Troop, New Braintree). Prior to becoming a trooper, I was a

Canton Police Officer in a full and part-time capacity from 2001 to 2006. I have a Bachelor of Science degree in Criminal Justice from the Northeastern University. I have attended numerous narcotics investigation courses, including a two-week narcotics investigation training with the DEA, focusing on narcotics recognition, identification, and investigation.

4. During my time as a police officer and TFO, I have participated in numerous investigations and arrests involving violations of state and federal controlled substances laws, including Title 21, United States Code, Sections 841(a)(1) and 846. A number of those investigations resulted in arrests, indictments, and convictions for violations of drug laws and/or other criminal offenses, the seizure of drugs, money, and vehicles, and the forfeiture of personal property. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

5. Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities. However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular

phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information. I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which drug traffickers use coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of telephone calls to avoid speaking over the telephone.

## PURPOSE OF AFFIDAVIT

6. I submit this affidavit in support of a criminal complaint against Yunior Rafael Pena Brito, a/k/a "Junior" ("YUNIOR") and Samuel Pena Brito ("SAMUEL"), charging that beginning at least in or about August of 2024 and continuing through at least October 8, 2024, YUNIOR and SAMUEL did knowingly and intentionally combine, conspire, confederate, and agree with each other and others known and unknown, to possess with intent to distribute and to distribute 50 grams or more of methamphetamine, a Schedule I controlled substance, and fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §846.

7. The facts in this affidavit come from my personal observations and information obtained from other agents, investigators, and witnesses. My interpretations of conversations, conduct, and events detailed herein are based on my training and experience and knowledge of the investigation. This affidavit is intended to show that there is probable cause for the requested complaint and does not set forth all my knowledge about this matter. All times herein are approximate.

**Procedural History**

8. On October 7, 2024, the Honorable M. Page Kelley, United States Magistrate Judge, District of Massachusetts, issued search warrants authorizing investigators to search 176 Ruthven Street, basement apartment, in Dorchester, Massachusetts ("176 Ruthven Street"); 96 Hancock Street, first floor apartment, in Dorchester, Massachusetts ("96 Hancock Street"); and 598 Hyde Park Avenue, third floor apartment, in Roslindale, Massachusetts ("598 Hyde Park Avenue") [Dkt. Nos. 24-MJ-6880 through 6883-MPK (under seal)].

**Probable Cause**

9. In August 2024, YUNIOR began using cellular phone (336) 577-7365 (the "7365 Phone") to contact an undercover officer (the "UC"), who was posing as a drug distributor, to set up drug transactions. For all communications detailed herein between YUNIOR and the UC, YUNIOR was using the 7365 Phone. All communications between YUNIOR and the UC were recorded and preserved.

<u>August 21, 2024: YUNIOR delivered samples of methamphetamine, fentanyl, and cocaine to the UC.</u>

10. During the week of August 19, 2024, YUNIOR and the UC exchanged a series of text messages. YUNIOR asked the UC to meet so that YUNIOR could provide the UC with a sample of drugs. YUNIOR also sent the UC a photograph which appeared to depict a kilogram brick of a controlled substance. On August 21, 2024, YUNIOR agreed to provide the UC samples of cocaine, methamphetamine, and fentanyl, and YUNIOR sent the UC a photograph of a bag that appeared to depict the drug samples prior to their meeting.

11. On August 21, 2024, YUNIOR and the UC agreed on a time and location to meet in Boston. Prior to the meeting, investigators set up surveillance in the vicinity of YUNIOR's residence, located at 176 Ruthven Street. YUNIOR arrived at the meeting location with the UC

driving a black Jeep. YUNIOR got out of the black Jeep and approached the passenger side of the UC vehicle. YUNIOR handed the UC a bag, which appeared to be the same bag that was depicted in the photograph YUNIOR sent prior to the deal. The meeting was audio recorded. The bag contained the three drug samples, which were sent to the DEA Laboratory for testing. The laboratory confirmed that one of the samples was 1.9 grams of cocaine, but the results for the other two samples are pending.

12. After the meeting, YUNIOR drove the black Jeep away and returned to the area of 176 Ruthven Street. An investigator saw YUNIOR exit the black Jeep and enter the front right door to 176 Ruthven Street.

<u>August 27, 2024: YUNIOR delivered methamphetamine and fentanyl to the UC.</u>

13. On August 27, 2024, the UC negotiated with YUNIOR over the 7365 Phone to purchase a half-pound of methamphetamine and 30 grams of fentanyl, and agreed on a time and location to meet. That day, investigators established surveillance in the vicinity of 176 Ruthven Street and 96 Hancock Street ahead of the buy. At approximately 1:39 p.m., an investigator saw YUNIOR and an unidentified male walking down the driveway to the right of 176 Ruthven Street.

14. YUNIOR and the unidentified male walked to the previously agreed location and met with the UC in the UC's vehicle. YUNIOR got into the front passenger seat and the unidentified male who was wearing a face covering got into the rear passenger seat. The unidentified male handed the UC a bag, which was later determined by the DEA Laboratory to contain 224 grams of methamphetamine (98% pure) and 29 grams of fentanyl and xylazine. In exchange, the UC handed YUNIOR $3,300.

5

<u>September 12, 2024: YUNIOR delivered 30 grams of suspected fentanyl to the UC.</u>

15.     On September 10, 2024, the UC contacted YUNIOR over the 7365 Phone to coordinate another drug purchase. The UC asked if YUNIOR would be available on September 12, 2024. YUNIOR affirmed ("Yea brot.") and asked what drugs the UC wanted to buy ("What are you going to need?"). The UC replied that he wanted to buy 30 grams of fentanyl ("Probably grab like 30 gram again."). On September 11, 2024, YUNIOR sent the UC a text message asking for a location to meet for the buy ("Send me the address to see how far I am.").

16.     On September 12, 2024, at approximately 11:00 a.m., investigators established surveillance in the vicinity of 176 Ruthven Street. At approximately 11:46 a.m., the UC suggested an address in South Boston to meet with YUNIOR. YUNIOR acknowledged and agreed to meet at the location.

17.     At approximately 12:30 p.m., an investigator observed a blue Honda CR-V (the "Honda CR-V") approaching the area of 176 Ruthven Street. At approximately 1:00 p.m., YUNIOR and the driver of the Honda CR-V arrived at the agreed upon location and parked next to the UC. YUNIOR got into the front passenger seat of the UC vehicle. YUNIOR handed the UC a bag containing a brownish powdery substance (suspected to be fentanyl), and the UC gave YUNIOR $900 in return. YUNIOR returned to the Honda CR-V and called the UC. During the call, the driver of the CR-V translated the conversation between the UC (who was speaking English) and YUNIOR (who was speaking Spanish). During that call YUNIOR and the UC discussed additional drug sales and drug prices. The field test on the suspected fentanyl was inconclusive, but based on its appearance and the prior August 27 buy of methamphetamine and fentanyl discussed above, I believe the substance is fentanyl. The suspected fentanyl was sent to the DEA Laboratory for testing, the results of which are pending.

<u>YUNIOR continued to negotiate additional drug sales with the UC.</u>

18. After the September 12 buy, the UC had additional voice and text communications with YUNIOR over the 7365 Phone about arranging future drug transactions and negotiating drug prices. During one text exchange, the UC asked YUNIOR if he could get a better price on a pound of methamphetamine ("I bought one pound in Lawrence for $2,800."). YUNIOR replied that drug prices were high because there was turmoil in Mexico ("What happens is that sometimes there are many everywhere and people sell it at that price but right now everything is difficult. Look at the news in Mexico. The cartels are at war so everything gets very difficult at the border.").

19. On September 16, 2024, the UC asked to purchase methamphetamine from YUNIOR, and YUNIOR agreed to sell the UC five pounds of methamphetamine at $3,500 per pound. The UC claimed he was sick and would have to delay the sale for about a week. YUNIOR continued to contact the UC to arrange a date and time to conduct the sale. On October 2, 2024, YUNIOR sent the UC a text message asking when the UC wanted to buy the methamphetamine ("Like when you plan to come?"). YUNIOR offered to lower the price for 10-gram fingers of fentanyl if the UC purchased 10 or more at a time ("From 10 fingers onwards I can do it to get it at 250 saves and when it's quantity it's better"). The UC replied that the fentanyl YUNIOR had sold him previously was high quality and that he would buy more if YUNIOR would lower the price ("The stuff I got last time was good, better than my other guy. I'll go with you for a lot more if we can work a good deal. I got money coming in, just want to make it worth it. You got me at $300 a finger, how many to get better price?"). YUNIOR asked how many fingers of fentanyl the UC wanted to buy ("How many do you need? . . . Of the brown"). The UC apologized for the delay in completing the sale ("Bad timing with me getting sick."). YUNIOR replied that he still had four pounds of methamphetamine ready to sell the UC ("Already those 4 that I have there will be yours

. . . I saved you 4 pounds only brother. I had to sell one. No problem."). The UC replied that he should be feeling better by the end of the week and wanted to buy the methamphetamine and fentanyl from YUNIOR ("I should be feeling better by the end of the week hopefully . . . Once I'm good, I'll come grab that ice and some brown.").

20. On October 5, 2024, YUNIOR sent a photograph of what appeared to be a kilogram of controlled substances to the UC. YUNIOR also sent a text message with the photograph which stated, "Special for you, brother."

21. On October 7, 2024, YUNIOR sent a text message to the UC asking if the UC could obtain firearms for YUNIOR. In other communications, YUNIOR agreed to meet the UC at a location in Boston on October 8, 2024, to deliver the previously negotiated four pounds of methamphetamine and fentanyl.

22. On October 8, 2024, YUNIOR arrived at the meeting location in the black Jeep. YUNIOR was in the rear seat, and two other males were in the front seat. YUNIOR told the UC that the drugs were going to be arriving on a scooter. Moments later SAMUEL was seen on a scooter approaching the area. Investigators stopped SAMUEL who had a bag that contained what is suspected to be, based on the investigation and the physical appearance, methamphetamine and fentanyl. Investigators arrested YUNIOR and SAMUEL on scene.

23. Investigators simultaneously executed the search warrants at 176 Ruthven Street, 96 Hancock Street, and 598 Hyde Park Avenue. Large amounts of yet to be identified suspected controlled substances and a stolen firearm were recovered from 598 Hyde Park Avenue. A large amount of suspected controlled substances, a firearm, and several thousand dollars in cash were found at 96 Hancock Street.

## CONCLUSION

Based on the information set forth above, I believe probable cause exists to believe that YUNIOR and SAMUEL conspired to distribute 50 grams or more of methamphetamine and fentanyl, in violation of 21 U.S.C. §846, as charged in the criminal complaint.

I, Brian W. Simpkins, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

/s/ Brian W. Simpkins

_____
BRIAN W. SIMPKINS
TASK FORCE OFFICER
DRUG ENFORCEMENT ADMINISTRATION

Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 this ___th day of October 2024.    October 8, 2024

_____
HONORABLE M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS